# In the United States Court of Federal Claims

No. 11-799 L

(E-Filed: July 2, 2012)

|  |  |
|---|---|
| STUEVE BROS. FARMS, LLC et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) Judgment for United States That No Taking by Flooding Occurs Absent Actual Flooding; Mere Apprehension of Flooding is an Incident of Ownership |

Robert H. Freilich, Los Angeles, CA, for plaintiff.

Joshua P. Wilson, Trial Attorney, with whom was Ignacia S. Moreno, Assistant Attorney General, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

OPINION

HEWITT, Chief Judge

      This is an action for just compensation pursuant to the Takings Clause of the Fifth Amendment of the United States Constitution. See infra Part I. Plaintiffs, the owners of land within the Prado Dam Flood Control Basin, allege that the government has effected a physical taking by subjecting their properties to a risk of flooding above the elevation allowed by the government's flowage easements. See infra Part I. Because plaintiffs' claims are premised on the "apprehension of future flooding" rather than on flooding that has actually occurred and which is sufficiently substantial to warrant analysis as a taking rather than a tort, the court grants defendant's motion to dismiss for failure to state a claim upon which relief can be granted. See infra Parts III-IV.

      Before the court are the United States' Motion to Dismiss (defendant's Motion or Def.'s Mot.), Docket Number (Dkt. No.) 7, filed February 29, 2012; Plaintiffs' Brief in Response to Defendant's RCFC 12(b)(6) Motion to Dismiss the Complaint (plaintiffs' Response or Pls.' Resp.), Dkt. No. 10, filed April 24, 2012; and defendant's Reply

Memorandum in Support of the United States' Motion to Dismiss, Dkt. No. 13, filed May 18, 2012.

    I.    Introduction[1]

Plaintiffs, Stueve Bros. Farms, LLC and Mill Creek Farming Associates, LLC (plaintiffs), are the owners of several parcels of land (plaintiffs' property) located in Chino, San Bernardino County, California.  See Compl., Dkt. No. 1, at ¶¶ 1-2, 7.[2]

Plaintiffs allege that the United States government (the government or defendant), acting through the United States Army Corps of Engineers (the Corps), id. ¶ 3, has "inversely condemned a permanent physical and title flowage easement across the Property . . . [by] authorizing flowage of impounded water from the newly elevated Prado Dam and Reservoir[,] . . . making the vast majority of Plaintiffs' Property subject to flooding and unfit for development of any kind, without the payment of just compensation" required by the Fifth Amendment to the United States Constitution, id. ¶ 34.

The government completed the Prado Dam in its original form in 1941.  Id. ¶ 9.  Plaintiffs' properties are in area that became the Prado Dam Flood Control Basin.  See id.  Because it was contemplated that releases of water impounded by the Prado Dam could inundate a portion of plaintiffs' properties, the government condemned flowage easements over plaintiffs' property to an elevation of 556 feet above sea level.  See id. ¶¶ 9-11.  Judgments establishing the flowage easements were entered in 1942 and 1945.  Id.

---

[1]The facts relied upon by the court in this Opinion are drawn from the allegations in plaintiffs' Complaint, Docket Number (Dkt. No.) 1, and do not appear to be in dispute.  Defendant suggests that, for context, the court take judicial notice of certain facts outside the Complaint.  See United States' Mot. to Dismiss (defendant's Motion or Def.'s Mot.), Dkt. No. 7, at 4 n.3.  However, defendant also states that "no fact outside the pleadings need be considered to dismiss Plaintiffs' claims."  Id.

Rule 12(d) of the Rules of the United States Court of Federal Claims (RCFC) provides that "[i]f, on a motion under RCFC 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56."  RCFC 12(d).  Because the information cited by defendant is not necessary to the court's disposition of defendant's Motion, the court declines to take judicial notice of the documents cited by defendant and will exclude the information presented by defendant from its consideration of defendant's Motion.

[2]Plaintiffs' Complaint consists of fifteen pages that include numbered paragraphs, a sixteenth page with some numbered paragraphs and some unnumbered text, and two further pages without numbered paragraphs.  See generally Compl.  The court cites to the numbered paragraph(s) or, for material not in numbered paragraphs, to the page number(s).

¶¶ 10-11. Plaintiffs do not allege that the government has exercised its rights under the flowage easements.

Beginning in or around 1976, the government began to plan a series of improvements (the Project) to provide additional flood protection to Orange County, Riverside County and San Bernardino County. Id. ¶¶ 12-13. When completed, the Project will raise the flood inundation line associated with releases of water from the Prado Dam by ten feet, to 566 feet above sea level. See id. ¶ 12. Pursuant to the "General Design Memorandum" developed by the government in 1980 in collaboration with Orange County, the Orange County Board of Supervisors and the Orange County Flood Control District (the Orange County Governmental Entities), the Project is to take place in three phases. Id. The first phase--the elevation of the Prado Dam and the Prado Dam Reservoir--was completed on or around December 1, 2008. Id. ¶ 31. In the second phase, the government plans to "[u]pgrade the existing title of the [Prado Flood Control Basin, previously taken by the government,] from easement to fee." Id. ¶ 12. Plaintiffs do not describe the third phase of the Project and do not claim that the second or third phases of the Project have been completed.

In 1989 the Corps entered into an agreement with the flood control districts of Orange County, Riverside County and San Bernardino County, pursuant to which all property and easements required for the Project--including, plaintiffs allege, property and easements in San Bernardino County--were to be acquired or condemned by the Orange County Governmental Entities.[3] Id. ¶¶ 12, 14. Between 1993 and 2008, the Orange County Governmental Entities acquired "numerous parcels neighboring and encircling Plaintiffs' Property." Id. ¶¶ 28-29. In 1999 the Orange County Flood Control District offered to purchase plaintiffs' property at a price between $6,000,000 and $9,000,000. Id. ¶ 18. Plaintiffs presented a counteroffer of $21,595,579. Id. No further negotiations took place and the Orange County Flood Control District withdrew its offer. Id.

The Corps has stated publicly that the Project will raise the flood inundation line associated with releases of water from the Prado Dam to 566 feet above sea level. Id. ¶ 20. In 2003 the Corps released flood plain maps showing the 566-foot flood inundation

---

[3]The federal statute authorizing the first phase of the planned improvements (the Project) provided that "[t]he non-Federal interests . . . shall provide all lands, easements [and] rights-of-way . . . required for the project" and requires that the Project be initiated "only after non-Federal interests have entered into binding agreements . . . to pay 100 percent of the operation, maintenance, and replacement and rehabilitation costs of the project, . . . and to hold and save the United States free from damages due to the construction or operation and maintenance of the project," with the exception of damages caused by the fault or negligence of the government or its contractors. Compl. ¶ 13 (quoting Water Resources Development Act of 1986, Pub. L. No. 99-662, § 103(i)-(j), 100 Stat. 4082, 4086-87 (codified as amended at 33 U.S.C. § 2213 (2006))). Plaintiffs do not state whether legislation authorizing and funding the second and third phases of the Project has been enacted.

line. See id. In or after 2003 the city of Chino amended its zoning regulations by adopting a "Preserve Specific Plan" (the Preserve Specific Plan) for an area that includes plaintiffs' property. See id. Although plaintiffs' Complaint does not describe the Preserve Specific Plan in detail, plaintiffs allege that, were it not for the 566-foot flood inundation line associated with the Project and shown on the Corps' 2003 flood plain maps, plaintiffs' property "would have been entitled to be[] zoned for high density, mixed-use residential, commercial, office and industrial uses." Id. ¶ 23. However, the city of Chino was required to incorporate the 2003 flood plain maps into the Preserve Specific Plan to maintain the eligibility of properties in the city for federal flood insurance. See id. ¶ 21. The Preserve Specific Plan "limit[ed] that portion of Plaintiffs' Property between the 556 and 566 foot flood inundation lines to passive recreation and open space use in an agricultural zone." Id. ¶ 24.

In or around June 2009 the city of Chino approved an amendment to the Preserve Specific Plan that "allow[s] for mixed-use residential, commercial, office and industrial uses" on the 131.7-acre portion of plaintiffs' property located above the 566-foot flood inundation line.[4] Id. ¶ 26. The amendment also authorized plaintiffs to collect soil from a portion of plaintiffs' property located below the 566-foot flood inundation line and use the soil to raise a 93.3-acre portion of plaintiffs' property above the 566-foot flood inundation line. Id. Plaintiffs estimate that the cost of moving this soil would exceed $10,000,000. Id. By a letter dated June 6, 2005 the Corps approved a proposal submitted by plaintiffs for the construction of a "high density, mixed-use development" located above the 566-foot flood inundation line on plaintiffs' property. Id. The Corps acknowledged in its letter that it had reviewed the proposal in light of "the future flood control easement" extending to an elevation of 566 feet, but did not state that the Corps had already acquired such easements. See id. Plaintiffs do not state in their Complaint whether they have constructed the mixed-use development approved by the city of Chino and by the Corps.

Plaintiffs filed this action in the United States Court of Federal Claims on November 29, 2011, see generally id., seeking just compensation of $60,000,000 plus interest, costs, attorney's fees and "such other and further relief as the Court may deem just," see id. at 16-18. Plaintiffs allege that, by entering agreements with local government entities, completing the first phase of the Project and taking "active steps to contemplate, identify and threaten Plaintiffs' Property with flooding . . . to a new 566 foot flood inundation line," defendant "has inversely condemned a permanent physical and title flowage easement across Plaintiffs' Property, for which compensation and severance damages [are] constitutionally required." Id. ¶ 38. Plaintiffs do not allege or

---

[4]Plaintiffs also describe this portion of their property (plaintiffs' property) as "an 'island' of approximately 33.5903 acres surrounded by a sea of flood plain restricted lands." Compl. ¶ 31. The size of plaintiffs' property or of the portion of plaintiffs' property above an elevation of 566 feet is not material to the court's determination of defendant's motion to dismiss.

argue that the government has effected a regulatory taking. See id. passim (describing defendant's actions as a physical taking); Pls.' Resp. 13 ("Plaintiffs in the present case do not plead, allege or claim that their takings claim is either a Lucas or a Penn Central challenge . . . ." (internal citations omitted)); Pls.' Resp. 32 ("Plaintiffs acknowledge that the Complaint does not plead a Penn Central regulatory taking claim, nor was one ever intended to be so pled.").

Defendant filed a motion to dismiss under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), arguing that "Plaintiffs do not allege a valid physical takings claim" because they do not allege that the government has flooded or otherwise physically invaded plaintiffs' property. Def.'s Mot. 6-7. Defendant contends that "'the Government could become liable for a taking,' only 'by such construction as would put upon [plaintiffs'] land a burden, actually experienced, of caring for floods greater than it bore prior to the construction.'" Id. at 8 (quoting Danforth v. United States, 308 U.S. 271, 286 (1939)). Defendant contends that, although plaintiffs allege that the Project "'threatens' and is 'intended to' cause flooding on Plaintiffs' properties to an extent that exceeds the scope of existing flowage easements on those properties[,] . . . there is no allegation that Plaintiffs' properties have actually experienced flooding of any kind--let alone flooding that exceeds the scope of the existing easements." Id. at 6-7 (internal citation omitted).

Oral argument has not been requested by the parties and is deemed unnecessary.

II.    Legal Standards

A.    Motions to Dismiss Under RCFC 12(b)(6)

A motion to dismiss under RCFC 12(b)(6) asserts a "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly (Twombly), 550 U.S. 544, 570 (2007)). When ruling on a Rule 12(b)(6) motion to dismiss, the court "must accept as true all the factual allegations in the complaint" and make "all reasonable inferences in favor of the non-movant." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001). However, "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

B.    Physical Takings and the Right to Just Compensation

The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation

5

in the event of otherwise proper interference amounting to a taking." First English Evangelical Lutheran Church of Glendale v. County of L.A., 482 U.S. 304, 315 (1987).

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005); see, e.g., United States v. Pewee Coal Co., 341 U.S. 114, 115, 118-19 (1951) (holding that the government effected a taking by "taking possession and operating control" of the plaintiff's mines to avert a strike). "[E]ven if the Government physically invades only an easement in property, it must nonetheless pay just compensation." Kaiser Aetna v. United States, 444 U.S. 164, 180 (1979). "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency (Tahoe-Sierra), 535 U.S. 302, 322 (2002) (internal citation omitted) (citing Pewee Coal, 341 U.S. at 115).

The government may effect a taking "by such construction as would put upon . . . land a burden, actually experienced, of caring for floods greater than it bore prior to the construction." Danforth, 308 U.S. at 286 (emphasis added). However, the "apprehension of future flooding" created by flood control legislation and the beginning of construction does not impose a flowage easement on a property that may be burdened by future flooding. United States v. Sponenbarger, 308 U.S. 256, 267 (1939) (noting that the particular floodway anticipated to threaten the plaintiff's property with flooding "might never be begun or completed"). "A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." Danforth, 308 U.S. at 285.

Not every flooding of land is a taking. See, e.g., Sanguinetti v. United States, 264 U.S. 146, 149-50 (1924). Once a property owner establishes that the government has caused or increased the flooding of his property, courts determine whether the government's conduct is properly categorized as taking or a tort[5] by considering: (1) whether the effects experienced by the landowner "were the predictable result of the government's action"; and (2) "whether the government's actions were sufficiently substantial to justify a takings remedy."[6] Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355-57 (Fed. Cir. 2003); see, e.g., Ark. Game & Fish Comm'n v. United States (Ark. Game & Fish), 637 F.3d 1366, 1376 (Fed. Cir. 2011) (describing the Ridge Line

---

[5]The United States Court of Federal Claims lacks jurisdiction to hear claims sounding in tort. See 28 U.S.C. § 1491(a)(1) (2006).

[6]If this inquiry "reveal[s] that a takings remedy is potentially available, [the plaintiff] must show that it possessed a protectable property interest in what it alleges the government has taken." Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355 (Fed. Cir. 2003).

test), cert. granted, 132 S. Ct. 1856 (2012); Cary v. United States, 552 F.3d 1373, 1376-77 (Fed. Cir. 2009) (discussing the application of the Ridge Line test in flooding cases).

In regard to the second prong of the Ridge Line test, the court must consider the frequency of the flooding. "'[I]solated invasions, such as one or two floodings . . . , do not make a taking . . . , but repeated invasions of the same type have often been held to result in an involuntary servitude.'" Ridge Line, 346 F.3d at 1357 (omissions in original) (quoting Eyherabide v. United States, 170 Ct. Cl. 598, 604, 345 F.2d 565, 569 (1965)); see also Ark. Game & Fish, 637 F.3d at 1374-75 (stating that the overflows of water must constitute a permanent invasion of the land, meaning that "there is a 'permanent condition of continual overflow' or 'a permanent liability to intermittent but inevitably recurring overflows.'" (quoting United States v. Cress, 243 U.S. 316, 328 (1917))).

III.   Discussion

Defendant contends that plaintiffs "do not allege a valid physical takings claim."[7] Def.'s Mot. 7. Citing Danforth and Sponenbarger, defendant argues that "a takings claim [can] be valid only after the plaintiff ha[s] actually experienced flooding imposed by federal action" rather than "an apprehension of future flooding." Id. at 7-8 (internal quotation marks omitted). Defendant contends that "a landowner asserting that government action has 'inversely condemned' a 'flowage easement' over his property--as Plaintiffs allege here--must point to permanent flooding, or multiple, actual physical invasions of water that are 'inevitably recurring.'" Id. at 8-9 (citing, inter alia, Ark. Game & Fish, 637 F.3d at 1374; Ridge Line, 346 F.3d at 1357). Defendant notes that "[h]ere, Plaintiffs do not allege any actual physical invasion of their property--let alone permanent or inevitably recurring flooding. Indeed, as Plaintiffs acknowledge, the project giving rise to potential increased flooding on Plaintiffs' property is not even complete." Id. at 9 (citing, inter alia, Compl. ¶ 31).

Plaintiffs respond that it is possible for the government to take a flowage easement even in the absence of "actual flooding." Pls.' Resp. 11. Plaintiffs contend that the government, "by subjecting Plaintiff[s'] property to the government's right to flood up to 566 feet above sea level, has imposed a physical title tak[ing] of a flowage easement upon Plaintiffs' property." Id. at 13. Plaintiffs contend that "[i]t is the easement that is the permanent physical taking, not the flooding that will eventually occur due to the raising of the elevation of the Prado Dam." Id. at 11.

---

[7]Defendant also contends in defendant's Motion that plaintiffs have failed to state a valid regulatory takings claim. Def.'s Mot. 9-14. Because plaintiffs concede in their Response to defendant's Motion that they have not presented a regulatory takings claim, the court does not address defendant's contention that plaintiffs have not stated a valid regulatory takings claim. See Pls.' Br. in Resp. to Def.'s RCFC 12(b)(6) Mot. to Dismiss the Compl. (plaintiffs' Response or Pls.' Resp.), Dkt. No. 10, at 13, 32.

Plaintiffs argue that the decision of the United States Supreme Court (Supreme Court) in Hurley v. Kincaid, 285 U.S. 95 (1932), supports their view that it is possible for the government to take a flowage easement without the occurrence of flooding.[8]  Pls.' Resp. 14-15.  According to plaintiffs,

> Pursuant to Hurley, it is the contemplation of the taking of an easement involving the future right to flood pursuant to the authorization by Congress to do so, coupled with the actual construction of the dam that will release the flood waters in the future, that constitutes a taking of a flowage easement for Fifth Amendment purposes, prior to and without any actual flooding of the land.  As Hurley held, Plaintiffs in the present case are not obligated to wait until flooding actually occurs so long as the project has been actually constructed and completed.

Id. at 15 (internal citation omitted).  Plaintiffs contend that the following government actions, taken together, satisfy the requirements of Hurley:  (1) passing legislation authorizing the first phase of the Project; (2) completing the first phase of the Project; (3) entering into agreements with the Orange County Governmental Entities requiring them to condemn or acquire plaintiffs' property as a condition of receiving funding from the federal government for the Project; (4) "preparation and distribution by the Corps of an official Map of Reservation of a second flowage easement over Plaintiffs' property at or below the designated 566 foot flood inundation line;" (5) "negotiations and offers to acquire fee simple title over Plaintiffs' property; and" (6) acknowledging in correspondence with plaintiffs "that [the Corps] was taking a future flowage easement over Plaintiffs' property at 566 feet."  Pls.' Resp. 2, 21-22.

Plaintiffs misinterpret Hurley and the cases that followed it.  In Hurley, the Supreme Court did not find that government's contemplation of a future taking, coupled with the government's construction efforts, effected a taking.  Instead, the Court addressed a different issue:  the remedy available to a landowner alleging a taking.  The landowner in Hurley sought an injunction to prevent "the receiving of bids and awarding of contracts for the construction of certain guide levees bounding the floodway."  Hurley,

---

[8]Plaintiffs contend that "[t]here are six categories of physical title takings cases, including but not limited to the physical title taking of flowage easements, that establish governmental liability for Fifth Amendment inverse condemnation of land, without actual physical flooding or other actual physical intrusion, invasion or trespass being required."  Pls.' Resp. 3.  Because there is binding precedent that clearly delineates when the government has effected a flowage easement by flooding, see supra Part II.B, the court is not at liberty to develop a new standard by analogizing to other areas of the law of takings, as plaintiffs urge, see Pls.' Resp. 22-31 (discussing the law applicable to "military artillery sites," "Rails-to-Trails easements," "navigation servitudes and other takings of title interests in property," "official maps of reservation and undue delay," and "Nollan/Dollan conditional dedication of easements" (some capitalization omitted)).

285 U.S. at 99. The Supreme Court determined that the landowner was not entitled to an injunction because "the complainant has a plain, adequate, and complete remedy at law": just compensation recovered pursuant to the Tucker Act once the taking had occurred. Id. at 103-05; see also id. at 104 ("The Fifth Amendment does not entitle [a landowner] to be paid in advance of the taking."). The Supreme Court merely "assume[d] that, as charged, the mere adoption by Congress of a plan of flood control which involves an intentional, additional, occasional flooding of complainant's land constitutes a taking of it--as soon as the government begins to carry out the project authorized." Id. at 103-04; see also Sponenbarger, 308 U.S. at 268 n.16 ("Whether recovery at law could be had . . . was left open by Hurley v. Kincaid."). The Court stated that it had "no occasion to determine any of the controverted issues of fact or any of the propositions of substantive law which have been argued." Hurley, 285 U.S. at 103.

After Hurley, the Supreme Court addressed--and rejected--contentions similar to those raised by plaintiffs. The landowner in Sponenbarger contended that her property was taken when flood control legislation went into effect and flood control work began on the planned ten-year project. Sponenbarger, 308 U.S. at 267. The Supreme Court disagreed, noting that "this contention amounts to no more than the claim that respondent's land was taken when the statutory plan gave rise to an apprehension of future flooding," which "might never occur for many reasons--one of which is that the . . . floodway [affecting the plaintiff's property] might never be begun or completed." Id. In Danforth, the landowner argued that the appropriation of his property had taken place when flood control legislation was enacted, when work began on the levy that threatened his property with flooding, or when the work was completed. Danforth, 308 U.S. at 283. The Supreme Court disagreed, stating that "[a] reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." Id. at 285. The Court did not determine in either case that a taking had occurred--or that a taking could occur--absent actual flooding of the landowner's property. Plaintiffs cite no case in which a court, applying the United States Constitution,[9] found that the government effected a taking by flooding before actual flooding took place.

The government has released flood plain maps reflecting the new 566-foot flood inundation line and referred in a letter to plaintiffs to a "future flood control easement" extending to an elevation of 566 feet. See Compl. ¶ 26. However, defendant's

---

[9]Plaintiffs contend that, "[i]n a case parallel to the present case, incorporating similar facts, regarding the Prado Dam project, the court . . . denied the defendant's motion to dismiss based on essentially the same operative facts as in the case at bar." Pls.' Resp. 8. The case cited by plaintiffs, however, was decided by the California Court of Appeal and concerned the rights of landowners under California law. See Barthelemy v. Orange Cnty. Flood Control Dist., 65 Cal. App. 4th 558, 563-65 (Cal. Ct. App. 1998).

acknowledgement that the Project may subject plaintiffs' property to future flooding and defendant's suggestion that the government may acquire additional flowage easements support, at most, an apprehension of future flooding. They do not support a finding that the government has already taken a flowage easement across plaintiffs' property. Similarly, the decision by the city of Chino to zone plaintiffs' property below an elevation of 566 feet for "passive recreation and open space use in an agricultural zone," see id. ¶¶ 24-26, reflects an apprehension of future flooding, not a recognition that the government had taken a flowage easement. Although the apprehension of future flooding may influence zoning decisions and the Corps' flood plain maps, it is insufficient to establish a taking under Sponenbarger.[10] See Sponenbarger, 308 U.S. at 267.

Furthermore, the allegations in plaintiffs' Complaint do not satisfy the tort/taking analysis set out in Ridge Line and applied by courts when the government has caused flooding. Pursuant to Ridge Line, the court must determine: (1) whether the effects experienced by the landowner "were the predictable result of the government's action"; and (2) "whether the government's actions were sufficiently substantial to justify a takings remedy." Ridge Line, 346 F.3d at 1355-57. Under the second prong of the Ridge Line test, "'[i]solated invasions, such as one or two floodings . . . , do not make a taking . . . , but repeated invasions of the same type have often been held to result in an involuntary servitude.'" Id. at 1357 (omissions in original) (quoting Eyherabide, 170 Ct.

---

[10] Plaintiffs claim that the government first released a map in 1989 showing proposed flowage easements to an elevation of 566 feet on plaintiffs' property. Pls.' Resp. 27, 30. Plaintiffs argue that there has been an "undue delay" in purchasing these easements, "freezing the development of Plaintiffs' land" for twenty-three years. Id. at 27-30 (some capitalization omitted). Analogizing to other areas of law and other types of takings, plaintiffs argue that this undue delay should be compensable as a taking. See id. Plaintiffs cite no case, however, in which a court has found that the apprehension of future flooding was transformed by the passage of time--or by the government's efforts to address this apprehension by planning to purchase or condemn flowage easements in the affected properties--into a taking. Such a finding is foreclosed by binding precedent. See United States v. Sponenbarger, 308 U.S. 256, 267 (1939) (stating that "an apprehension of future flooding" is insufficient to establish a taking); Danforth v. United States, 308 U.S. 271, 286 (1939) (stating that the government effects a taking by flooding that is "actually experienced"); cf. Fromme v. United States, 188 Ct. Cl. 1112, 1119, 412 F.2d 1192, 1197 (1969) (finding that flooding occurring every fifteen years did not effect a taking).

To the extent that plaintiffs could be understood to be arguing that the map developed by the government functioned as a "Map of Reservation" that violates plaintiffs' right to due process under the Fifth Amendment to the United States Constitution, Pls.' Resp. 27-30, plaintiffs do not state a claim within the jurisdiction of the court, see Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1334 (Fed. Cir. 2006) ("A violation of due process rights . . . does not give rise to a claim for money damages against the United States in the Court of Federal Claims.").

Cl. at 604, 345 F.2d at 569).  The overflows of water must constitute a permanent invasion of the land, meaning that "there is a 'permanent condition of continual overflow' or 'a permanent liability to intermittent but inevitably recurring overflows.'"  Ark. Game & Fish, 637 F.3d at 1374-75 (quoting Cress, 243 U.S. at 328).

The United States Court of Claims found that flooding that "can reasonably be expected to recur at intervals of about once in every 15 years, on the average . . . lacks the future prospect of intermittent and frequent floodings which the Supreme Court mentioned in the Cress case."  Fromme v. United States, 188 Ct. Cl. 1112, 1119, 412 F.2d 1192, 1197 (1969); see also Bryant v. United States,[11] 216 Ct. Cl. 409, 410 (1978) (finding that flooding occurring every thirty years "does not satisfy the proof required to show that Government action has in effect taken an easement over plaintiffs' property"); Big Oak Farms, Inc. v. United States, No. 11-275 L, 2012 WL 1570878, at *7 (Fed. Cl. May 4, 2012) ("Allegations of two floods separated by nearly 75 years are not enough to support an inference of frequent and inevitably recurring flooding to satisfy the Ridge Line test.").

Plaintiffs do not allege that, as a result of the Project, their property will be subject to "'intermittent but inevitably recurring overflows,'" see Ark. Game & Fish, 637 F.3d at 1374-75 (quoting Cress, 243 U.S. at 328), occurring more often than every fifteen years, cf. Fromme, 188 Ct. Cl. at 1119, 412 F.2d at 1197, or even every thirty years, cf. Bryant, 216 Ct. Cl. at 410.  When ruling on defendant's Motion, the court is required to draw "all reasonable inferences in favor of the non-movant."  Sommers Oil, 241 F.3d at 1378.  However, plaintiffs allege no facts that would support an inference that plaintiffs' property will be subject to intermittent but inevitably recurring overflows.  Plaintiffs, in fact, do not allege that the government has ever exercised the right it has held for approximately seventy years under the existing easements, see Compl. ¶¶ 10-11, to flood their property to the lower elevation of 556 feet above sea level.

Plaintiffs' claims are based on "an apprehension of future flooding," see Sponenbarger, 308 U.S. at 267, rather than flooding "actually experienced," see Danforth, 308 U.S. at 286, as a result of the government's actions.  Furthermore, plaintiffs do not allege the type of "'repeated invasions'" required to establish, under

---

[11]Bryant v. United States, an order deciding a motion for summary judgment, appears in the Federal Reporter in a table of "Decisions by Order Without Published Opinions," see 578 F.2d 1389 (1978), and is erroneously described as an unpublished opinion on www.westlaw.com, see Nos. 15-75, 76-77, 1978 WL 23800 (Ct. Cl. Mar. 17, 1978).  However, the order is published in the United States Court of Claims Reports, 216 Ct. Cl. 409, the official reporter of the United States Court of Claims, see Commodities Recovery Corp. v. United States, 34 Fed. Cl. 282, 292 n.9 (1995), and is therefore a published decision, see id.; Daniels v. United States, 77 Fed. Cl. 251, 255 n.4 (2007), aff'd, 269 F. App'x 976 (Fed. Cir. 2008) (per curiam) (unpublished).  The order is correctly reported on www.lexis.com.  See Bryant v. United States, 216 Ct. Cl. 409, Nos. 15-75, 76-77, 1978 U.S. Ct. Cl. LEXIS 75 (Ct. Cl. Mar. 17, 1978).

11

Ridge Line, that it would be appropriate to treat any harm to plaintiffs' property as a taking rather than as a tort.  Ridge Line, 346 F.3d at 1357 (quoting Eyherabide, 170 Ct. Cl. at 604, 345 F.2d at 569).  Plaintiffs contend that the government has "subject[ed] Plaintiff[s'] property to the government's right to flood up to 566 feet above sea level." Pls.' Resp. 13.  However, "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  Plaintiffs have therefore failed "to state a claim upon which relief can be granted." RCFC 12(b)(6).

    IV.    Conclusion

For the foregoing reasons, defendant's Motion is GRANTED.  The Clerk of Court shall ENTER JUDGMENT, dismissing plaintiffs' claims with prejudice.

No costs.

IT IS SO ORDERED.

                            s/ Emily C. Hewitt
                            EMILY C. HEWITT
                            Chief Judge